131959 131960 Universal Settlements International v. Natl Viatical Incorporated et al v. Universal Settlements International Arguments not to exceed 20 minutes per side Mr. Graham for appellants May it please the court, Jason Graham for the appellants. I would like to reserve five minutes for rebuttal if that's okay. The court is hearing two appeals today in related cases. In the 1960 case, case number 1960, the issue presented is whether the district court erred in granting summary judgment by finding no issue material facts as the USI's, excuse me, the appellee's breach of confidentiality requirement of an oral settlement contract and damages. The terms of the confidentiality requirement and whether the first breach doctrine excuses NVI's performance. Excuse me. Sorry about that. Whether the first breach doctrine excuses NVI's performance of the settlement agreement. The 1959 case has to do with if summary judgment was proper, is the $5 million judgment that was entered for failure to pay a $1 million settlement amount, an unlawful penalty. Bad time to lose my voice. This court previously affirmed the district court's finding that my client's appellants did not have a likelihood of success on the merits of these same issues under a very different standard than summary judgment standard. In the context of the dissolution of an intellectual injunction that had prevented USI, the appellee, from asserting default remedies for about 16 months, the district court set as a fact finder and this court reviewed under the clearly erroneous standard of review. Appellants believe that the district court again set as fact finder in granting summary judgment despite conflicts in the evidence and genuine issues of material fact. The standard for likelihood of success is not the standard for surviving summary judgment. Reviewing this case de novo, the court should reverse and remand for a jury trial on all issues. The settlement agreement at issue here was an oral settlement agreement at a judicially hosted settlement conference where the settlement was put on the record with a court reporter and we have the transcript in the record. The confidentiality term was talked about at length in the transcript and in the transcript it was agreed that USI that was also in a Canadian version of bankruptcy would use good faith efforts to get the Canadian court to honor the confidentiality and that there would be limited disclosures to be limited to the extent necessary on a need to know basis. Let me say confidentiality. Didn't that refer to the $5 million judgment? Weren't the parties and the magistrate talking about confidentiality as to this $5 million amount and not as to other aspects of the settlement? There's a correct reading of the evidence on that issue. The appellants, the appellees contend that the confidentiality only related to this one term. We put evidence in the record that confidentiality was supposed to apply to all terms. One of the pieces of evidence that conflicted with that was in the transcript we said we'll agree to a standard confidentiality clause. Well, appellees counsel did the first draft of the settlement agreement, the written agreement that was not signed, but it had a confidentiality clause which is plural evidence of what everybody meant by standard and it said the terms of the agreement should be held in strict confidence subject to disclosure to the Canadian court and the monitor, kind of like a trustee. So right there there's conflict in the evidence on that issue, the scope of the confidentiality. There was a, your Honor, probably thinking of the magistrate judge saying, okay, my understanding of the concern here is the $5 million penalty. Yeah, that's part of it, certainly. And my client's affidavit, he said, yes, that was an important concern. It's not the only concern. There's other evidence to support that. The transcript does not indicate anything about notifying creditors, anything about putting on a publicly available website. That's another conflict in the evidence. The district court relied on my client's statement that, okay, they're going to put it on a website, I don't care. That there was some consent to do what was done here in terms of putting it on the homepage of a website. There's conflict in the evidence on that. My client testified by affidavit that I was referring to a limited access website. We had just been talking and the pages around that comment were talking about PACER, what would appear on PACER. I'm familiar with how this works with limited access websites. I knew we couldn't keep it absolutely secret, but that's why we agreed to use good faith efforts to keep it as secret as possible and to get the Canadian court to do the same. Indeed, the district court itself acknowledged that the precise contours of the confidentiality provision were not spelled out. The appellees point to the Bennett Declaration, which was the declaration of their Canadian counsel, as to what he did in terms of submitting to the Canadian court, and said that the Canadian court instructed him over a telephone to have this on the website. They argued, well, that's undisputed evidence, we win. Interestingly, that declaration itself creates an issue of fact because of what it doesn't say. It doesn't say, and we asked the judge, well, could we not put it on the website? Could we send emails to creditors? There's something else other than putting it on the World Wide Web that we could have done. The declaration itself is evidence that USI did not use good faith efforts to get the Canadian court to protect confidentiality as much as possible. These are issues that the jury should have decided. Do we treat the settlement agreement as if it were a contract? Yes, Your Honor. So we apply normal contract principles to decide whether there is any breach of the contract by either side. Is that right? Both for construction of the contract and to determine breach. The interesting thing here is it's an oral settlement that's put on a transcript, but the transcript isn't a written contract per se. It's evidence of the oral settlement. The same rules of contract construction apply, and whether the settlement was breached, you apply normal contract principles. Now, the district court also ruled that, okay, well, even if you survive summary judgment and you prove that USI breached the confidentiality, I'm declaring as a matter of law that that is not a sufficient first breach to excuse performance under the first breach doctrine. Isn't that normally an issue that is decided as a matter of law or not? I don't believe so, Your Honor. It can be decided as a matter of law, but the test is, the test is did it frustrate the essential purpose of the contract, such that there was a failure of consideration, and the conflicting of it. Why would there be any argument here that that was such a major breach that you should be able to avoid paying the $1 million to the other side? The evidence supporting that was my client's declaration that this was essential. Confidentiality was essential. The mediator, who is also the magistrate court judge, also said that she recalled that confidentiality was very important to Mr. Torsha. The jury could have found from that evidence that paying $1 million on an alleged $15 million claim, one-fifteenth of what they were suing for, was for the purpose of getting a confidential settlement. He'd been sued for fraud and stealing for three years and wanted to put that behind them and have a confidential settlement. Whereas if you, same reason why under the rules of evidence, settlement talks are not admissible, because people assume that if you're going to pay money, you're guilty. The jury could have found that the primary consideration for my client was the confidentiality and not having to go to a jury trial. That feeds over into the next issue, which is if the court does affirm, this court affirms a grant of summary judgment. The next step is to look at the $5 million judgment that was entered. What I was just saying about the confidentiality, my clients have maintained throughout that the prior suit that was settled was frivolous. It was worth zero. We had lots of evidence, as discussed in the briefs, in terms of why we were going to win and not them. They put in their evidence why they think they were going to win and not us. But in examining whether this is a penalty, first, that issue is timely. The 2011 judgment that was not appealed at the end of the first case with a settlement says in the event of a default, you have to pay $5 million. It's not a final order. It contemplates further action by the district court, which in fact happened. Even though my clients took the position under the first briefs doctrine they were not in default because they were excused from performance, if they were wrong on that issue and they were in default, then the appellees had to give notice and opportunity to cure. That was actually enjoined by the district court for 16 months. It was when the prior opinion came down dissolving the injunction where we got the 10-day notice to pay the whole million dollars within 10 days. So appellee filed a motion to enter a judgment for $5 million. The district court gave an opinion. We litigated these issues of usury and penalty. It was briefed. It was heard. Then the district court entered an opinion in order and a judgment for $5 million. That judgment was timely appealed. We cite the Third Circuit WRS case in support of that analysis. Even the Xerox case, the First Circuit case, cited by the appellees on the penalty issue notes that the challenge could be a Rule 60B challenge, the denial of which is immediately appealable. So it's timely. Now, if I lose on summary judgment, should my clients have to pay $1 million or $5 million? That's the question. Is that $4 million a penalty or is it a reasonable pre-estimate of the loss? There's conflicting case law in this. The First Circuit, applying Illinois law, basically held that, look, we're going to treat settlement contracts differently. You're going in with your eyes wide open. You usually have counsel. You're sophisticated. In that case, they still did a penalty analysis. They said, well, this higher amount is a reasonable estimate of damages. And in that case, it had to do with – it was also different procedurally, that Xerox case, because the consent judgments were entered for the higher amounts and there was forbearance. It wasn't a, if you default, you get hit with extra money. It was the million-dollar judgments were filed, they were entered, and then there was a default and they just stopped forbearing and then the penalty argument came up. So procedurally, that's also a different way. Now, the Seventh Circuit, in two opinions, Checkers and Scavenger, says, look, we're going to look at these just like we do contracts and we're going to look at whether it's a reasonable pre-estimate of the loss, whether it's designed to coerce performance, because that's the public policy behind not having penalties in contracts, that we don't want to coerce performance, we should allow efficient breach, and the damage from not paying or not paying on time is the time value of money, which we can easily ascertain in interest. The Scavenger case, and it's funny, they also apply Illinois law like the Xerox case, but much later. The Scavenger case, where they were asked to overrule Checkers and they didn't, it's interesting because that case upheld the higher amount. And the reason, and if you look at why they did that, it shows why this case is different. They had agreed on an amount that was due before the settlement. Summary judgment had been entered for the $1.6 million. It was a note case, promissory note. Very liquidated, easy to ascertain. So there the court did look at what happened in the underlying lawsuit. They'd already had summary judgment for an amount of money. That was the penalty amount, if you will. And so we'll allow that because it's reasonable. It's a fixed amount. In this case, it's not a contract case. We have a multi-account complaint alleging all kinds of torts and fraud and treble damages, counterclaims, heavily contested. Appellees cite to the denial of our motion for summary judgment in that case as evidence that it was a weak case. Well, again, the district court there had to view all the facts most favorable to the appellees in denying summary judgment in the underlying settled case. So when you look at ascertaining what's reasonable for a penalty or liquidated damages in our case, well, it could have just as likely been zero as $5 million or $15 million. And the parties agreed to replace that uncertainty in the cost of trial with this settlement contract. That settlement contract is governed by contract terms, contract and construction. And in any other universe, a $4 million penalty for not paying $1 million would be struck down. And there's no reason to have an exception here because it was a settlement of a lawsuit. Thank you. May it please the court. Robert Franzinger on behalf of the Appellee Universal Settlements International, Incorporated, which the parties generally refer to as USI. I would suggest to the court that almost nothing that you heard this afternoon is an accurate reflection of what is in their record. I think that we should probably start with just looking into where we were on October the 26th of 2010 when we sat down for a settlement conference. It was the second settlement conference we'd had in the case. The reason we were having our second settlement conference was because the opposing parties, particularly Mr. NVI and Mr. Torchia, had taken the position that the real parties in interest in this controversy were the shareholders and creditors of USI in the Canadian equivalent of a Chapter 11, the CCAA case. So they said they didn't come to the first settlement conference. They need to be here. Right there you have a recognition of the importance that the real party in interest here, or an important party in interest who needs to be consulted, is the Canadian Bankruptcy Court. While formal approval isn't necessary, there needs to be something that happens there. We were two weeks from trial. We had a very, very strong case. If you read that denial of the motion for summary judgment, the evidence was overwhelming that this had been an out-and-out theft of $5 million, likely to be troubled, plus exemplary damages. Why did we settle? Well, this is why we settled. They came to us and said, look, you may have a strong case, but we don't have any money. And frankly, we're not going to be trying this case here. We're going to be trying it in Georgia because we're going to be in bankruptcy. And so they said, regardless of what you're going to do here, you need to come to the table and settle. Now, this is nothing new. This is a very common type of a settlement. And all of this is in the record? Some of it is in the record, and the structure that results from that is evidence of what exactly was concerned. But we don't even need to talk about specifically whether that's the case here because this is a common situation, and frankly, if you accept their construction of this penalty provision, you're never going to settle a case like that because what do you have to do to settle a case like that? You have to, if you're going to settle that case, and you're going to be in line with other creditors, the last thing you're going to do, the last thing we would have done, is reduce a $15 million claim to a $1 million claim and then get in line with everybody else to get a portion of our $1 million. It would destroy the opportunity to settle the very kinds of cases that you really want to settle. One where I know when I'm a mediator and I hear that that's an issue and collection is an issue, I jump up my ears perk up. I go right in there and say, okay, well, how are we going to do this? And that's why we did what we did. Well, as I understand it, Mr. Torsha and NVI say your case was not nearly as strong as you are suggesting, that in fact it was close to being frivolous, and that you might be happy to take $1 million on a $5 or $15 million claim. And the reason this is relevant here, somewhat relevant here, is that there is some schizophrenia in their position about what the rules are with respect to this penalty thing. They claim sometimes that it's a federal rule, and they claim sometimes that it's a state rule. They argue that it's a federal, but then they cite only cases that apply state law in diversity cases. And frankly, the only real case that purported to apply federal law to this circumstance was the Xerox case that they talked about. And that case came out in our favor. In that case, the court said, for purposes of analyzing a penalty, you don't do what NVI and Torsha want to do, what the appellants want to do. You don't look just at the settlement and say, okay, wait a minute. There's a $4 million penalty here because you contractually agreed to $1 million, and you're paying $5 million. They said, no, that's myopic. That may be the rule when you're talking about a general contract, but we're not talking about a general contract here. We're talking about a settlement of a lawsuit, and that introduces a whole different set of considerations. Trial costs. Probably in Mr. Graham's case, having to come from Georgia and having to try a case in Grand Rapids in January probably wasn't very attractive to him. But likelihood of success. Vagaries of a jury trial. It introduces a whole different idea. And what that court said was, you're using the wrong benchmark when you're comparing the equivalent of the 1 to the 5 here. What you've got to look at is compare the 1 or the 5 to the 15 because that's what you're settling. That's the deal. You are creating what's called an accord. Willison recognizes this and says that when you are using the benchmark for deciding whether this is a reasonable settlement or whether this is a penalty, you compare what you're entitled to in the event of the default versus what you might have recovered in the lawsuit. That's a great comparison. And what they did in that case was they said, you know, this is not a penalty. What happened in that case was the entry of a judgment for $6 million or more for failure to pay a $125,000 settlement fee because they said the comparison isn't between the 125 and the 6 million. It's between the 6 million and the claims in the case. The Seventh Circuit has pretty much come out the same way, although they applied federal law. You had Mr. Graham misstated the scavenger case. The scavenger case, first you had the checkers case, and that's a case where the court split 2 to 1. Two judges said, we look at this as a question of state law. We think that Illinois would apply the type of analysis that they argued. The dissent said, no, that's crazy. I can't believe Illinois would do that. They would, in determining whether there's a penalty involved here, they would look at comparing the claim in the underlying lawsuit versus what is being paid in the event of a default, and they would come out a different way. Then you had the scavenger case, and the scavenger case came out the other way. It came out, again, purporting to apply Illinois law, the way the Xerox case did. They said, your benchmark has got to be the underlying claim. It's not to compare what you pay under two different contractual terms. That's what we had here. What we had here, and it is quite clear from the transcript in this case, that there was to be a judgment immediately entered for $5 million. That was non-negotiable for obvious reasons on our side. We weren't going to get in line in this threatened bankruptcy with a $1 million claim. We were going to get in line, at best, with a $5 million claim. Is $5 million a reasonable resolution of this claim? Yes. Mr. Graham was asked a question about contracts, and he answered correctly in terms of some of these confidentiality issues. Yes, contract issues apply here. But for purposes of the analysis of the penalty issue, the alleged penalty issue, that's not the case. Was there a requirement that some notice have to be given and the other side have the opportunity to pay the $1 million before the $5 million went into effect? Yes. Was that notice given here? Yes, it was. I hate to use this term, but the district court used it, and I think it's fair here. That was one of the acts of gamesmanship that occurred here. What they did was, on the confidentiality term, when they went before Magistrate Judge Carmody, who had been involved in addressing the entire settlement agreement, there were two motions. They only talk about their own motion, but the co-defendant, Mr. Chilolo, represented by the insurance company, filed a motion for sanctions against USI for doing what it did at the direction of the Canadian Bankruptcy Court. It's not the name of it. Ontario Provincial Court, I believe. The judge decided that motion. The magistrate judge decided that motion against that. She, who had been involved in the detailed settlement negotiations, said they didn't do anything wrong here. USI did exactly what they had to do and what they said they would do, and what Mr. Bennett thought he would do and thought he could do, but didn't know he could do in Canada.  Once Mr. Graham saw the handwriting on the wall, he was going to lose his motion to amend his complaint to assert such a claim. He withdrew his motion, ran down to Georgia, got an ex parte TRO against our giving the notice of default, didn't tell the court down there that the magistrate judge up here had ruled against him. Got an ex parte TRO, and that stuck around for 16 months until we could get the case back up here and back before the court here, which, when it found out what had happened, said this is just not what I ordered. But what you have, so what we have here, we're not dealing for purposes of, set aside the confidentiality issue for a minute, for purposes of the 1359 issue, we're dealing with a consent judgment. There was an agreement to the entry of a consent judgment. That judgment, the essence of what they're challenging here, was issued, entered back in 2011. They didn't appeal, they never filed a motion for reconsideration, and it makes crystal clear that there is a judgment in place. And if, in the event of default, the judgment will be immediately entered, judgment will be, this judgment is $5 million. You can start collecting on $5 million. Now, we went through the additional step of getting a clean $5 million judgment, but there's no dispute that there was a default. There's no dispute that the notice was given. The notice was given 16 months after we could have given it, because we had the TRO hanging over our heads, improperly obtained through gamesmanship, I would submit. But there was no notice that was agreed upon between the parties in terms of what could be set forth in the Canadian bankruptcy proceeding, and that's given rise to so much of the dispute we have here now. Correct. That is a different question from the one I was just answering, which was the notice of default. If I think a fair reading of that transcript actually is what the parties agreed to do was to engage in good faith negotiations to draft a written terms of a confidentiality agreement that would accommodate the recognized need to go to the CCAA court to get whatever you want to call it, blessing approval. They make a big deal about saying formal approval wasn't required, but that was made clear by Mr. Bennett on the record at the settlement conference. He said, I don't think that's formal approval. It's not entirely clear what I've got to do, but I've got to give notice and an opportunity for the creditors to object, and that was recognized throughout that transcript. The essence of your opponent's argument, as I understand it, in the 1960 case is that confidentiality was a critical term of the contract and that there's a fact question as to whether the actions of your side breached the confidentiality requirements. So I don't think we've gotten to that topic, if you want to address that. I'd be happy to address that. First of all, the existence of a fact question isn't enough to defeat summary judgment. What you have to have is a genuine issue of material fact raised by competent evidence. Here, I don't think you need to go much farther than what this court has already done in its prior appeal, because while technically you're right, Mr. Graham is correct, that the standards are a little bit different on a preliminary injunction, the stepping stones that the court decided, apparently this court decided, in breaching that are dispositive. They're largely dispositive in matters of the law. For example, interpreting the contract, the contract doesn't support your position, and things like that. And not much, frankly, of any relevance has happened since then. Nothing material has changed since the first opinion. The court was presented below with the affidavit declaration of Mr. Bennett, who was the Canadian lawyer in the CCAA proceeding who appeared at the settlement conference and said what he hoped and thought he could do, and in fact, that's exactly what he did do. He went to the court in Canada and said, this is what I need to do. He was able to do it in an off-the-record chambers conversation, because that's what they wanted. He then asked the court, what do I do? And the court directed him to do the following, which included putting the notice on the website. Now, the website was known to be a very important part of the Canadian bankruptcy proceeding, because you had thousands of investors involved all over the world. The notice that's put on the website is the $1 million judgment? The notice that's put on the website contains the information that Mr. Bennett said he would put in, in which he said, among other things, there's a total of $1.2 million. It didn't say who was paying what, because that included a $242,000 contribution from Mr. Chilelo. It was $1.2 million from the other side, from you, right? I mean, that was clear from the notice, right? It was their side paying $1.2 million. The defendants among themselves in that case would pay $1.2, but no indication of which defendant was paying what, which is exactly what Mr. Bennett said he hoped he could do. He said, I don't think I have to put the $5 million on the record. If I can tell them that we're getting at least $1.242 million, and they approve that, the fact that there's actually $5 million, how for sure are they would approve that? So we didn't put in the information that Mr. Torshia said he was concerned about. Mr. Graham has frankly misstated to you today, and obviously the affidavit or the declaration of Mr. Torshia cannot be squared with the record. He said the statement that they're going to put it on a website was made in the context of the discussion about what would be entered on the record in Grand Rapids when this settlement went forward. That's not the case. It was made in specific reaction to a statement by Mr. Chilelo's lawyer that why don't we just exempt out whatever needs to be done in the Canadian court. Mr. Sullivan, Mr. Chilelo's lawyer, page 14 of the transcript, why don't we just exempt from confidentiality except to the extent necessary for reporting to the Canadian court  Mr. Torshia blurts out, then they're going to put it on a website, right? My statement, I don't know Mr. Torshia, I mean I don't care. It doesn't matter. Clear. He recognizes, how does he know that it needs to be put on a website? He knows that because he's been a participant in that proceeding as a creditor. They made a claim in that case on the basis of this sham agreement to manage policies where supposedly USII agreed to pay them $5 million up front for 20 years of work to perform services that USII did in its core business. I mean the underlying case is a very, very strong case. There was a very high risk of exemplary damages. As to this whole website issue, isn't there a claim by the defendants that their belief was that this notice would be posted on something like Pacer as opposed to any website? Right. They didn't object apparently at the conference, but there was somewhere in the record an indication that that was their belief, someone's belief on the website. That argument is belied by what I just read to you. What Mr. Torshia claims is that he thought we were talking about what's going to happen in Grand Rapids in the district court? What's going to be entered on the record? Is that $5 million judgment going to be on the record? No. The argument is that he thought that's what we were talking about. There's no Pacer in Canada. Okay. There was never an issue with respect to that. He says what I was thinking about when I said it's going to be on the website is what's going to happen with the $5 million judgment in this case? Is it going to be on Pacer? That's what I'm concerned about because I don't want my creditors to think I've got a $5 million judgment out there when even though there is a judgment for $5 million, I might not ultimately have to pay it if I can satisfy that judgment with a $1 million payment within a year. I guess at the end of the day there are so many on the record and off the record things that appear to be going on in this case. What's really your best argument that USI did not breach the confidentiality agreement? If you had to just net it out here. Sure. There are a couple. The first is what we've just been. They did exactly what they said they would do and what everybody recognized they had to do. They went to the Canadian court. They said, what do we have to do to get your blessing? Everybody understood that we needed the blessing. They even asked, they insisted as part of the agreement on the record, you will agree to recommend this to the bankruptcy court. It's clear they did exactly what they said they would do and they did no more and there's no contrary evidence. None. Mr. Bennett, after this case was here and the court found that, in the opinion that the contract terms don't support your argument, nothing else happened. They took no discovery. They could develop no competent evidence. They didn't go to Ernst & Young and get a declaration from them. They didn't even, to this day there's information still on Ernst & Young's website. To this day. What does that tell you about materiality? That's really the best argument. There are two really dispositive arguments as a matter of law in this. Number one, that to excuse performance of a contract, there's got to be a material breach. The standard is a standard of law, which the court indicated they'll never meet in this case. That is that it renders the non-breaching party's performance impossible or fruitless. Number two, that these arguments about material breach is based in the concept of rescission of the contract. What it does is it requires you to re-tender back the benefit that you got from the contract that you say you can't perform. Your red light is on, so I'm afraid we can't conclude. Thank you. If my clients were okay with this going on any website accessible to public, why would we have spent any time talking about confidentiality at all? That's the most public advertisement that you could possibly do of a settlement. If that's what was intended, as Mr. Franzinger just argued, there wouldn't have been any need to even discuss confidentiality. In terms of what they agreed to in the transcript. Did your clients articulate any specific websites or other types of sites that this could go on? My client's declaration followed the matter. He said that we were just talking about PACER. We're talking about things going, you know, notifying the court. That's what I meant by website. And it's not just his subjective intent. You can look at the pages surrounding that comment, and there's talk about PACER. There's talk about limited access websites, which he acknowledged you might have to do. Well, this is affidavit, obviously, after the settlement conference. Wasn't that raised at all during the settlement conference or contemporaneously with what was going on in terms of notice that would be posted? No, Your Honor. In fact, during the settlement conference that's on the transcript, there is no discussion of we'll have to notify creditors. There's discussion we'll have to notify the court. What Mr. Bennett actually says on page 13 of the transcript is, I think I can do it by presenting a chamber's motion, like, you know, doing something under seal. In his view, the consent judgment is simply a default mechanism that supports our penalty argument. So it can be reported as being settled for total settlement at this point, $1.242 million. But he's saying I'm going to tell the court that. He's not saying I'm going to put it on the World Wide Web or even that we have to tell creditors. Mr. Busick, who's representing the creditors committee, said, I agree on behalf of the creditors. We were not aware of any requirement to notify creditors. It's not in the transcript. It's also not in the draft settlement agreement that wasn't consummated. On the penalty issue, in the settlement transcript, Judge Carmody says, Well, at one point, Mr. Franzer says, it turns from $1 million to $5 million if there's a default in payments. And later, Judge Carmody says, quote, it doesn't really become a judgment for $5 million until he defaults on some part of the agreement, close quote. So it doesn't become a judgment for $5 million until there's a default. Now, what the district court actually entered in 2011 was titled a consent judgment, but it's not signed by counsel for either party. And it says, in the event that defendants default on the settlement agreement, USI shall recover, generally and severally, the amount of $5 million. And then we went through the process of litigating a motion to enter the judgment. There was a question about the notice and opportunity to cure. This was a one-year payment plan for $1 million, and it had a 10-day notice and opportunity to cure. I had the first payment in my old account. This was in the record before we found out about the website. And we had the benefit of an injunction. It started off as an ex parte injunction, but it wasn't challenged for 16 months. And it continued in effect. And they could have moved the dissolve or asked for a bond on day one in federal court. Instead, they waited 16 months. If they had asked to pay it in the registry of the court or post a bond, the district court probably would have made us do that, and we wouldn't be here. But when we got the notice, it was, you have 10 days to pay the whole one-year payment of $1 million. Granted, that year had passed, but it had been stayed by this injunction. So the inherent unfairness, the public policy behind not penalizing breach of contract, enforcing 10 days to come up with $1 million, or even if you count the 14 days the court gave before the dissolving injunction, one year of payments, a whole million dollars, and then it hit with a $4 million penalty on that 10-day notice, that's against public policy. That's to coerce performance. And we should have had the benefit that even though the injunction was ultimately dissolved, it was still in place for 16 months. And the question for this court is really whether there's an exception to this public policy about not having penalties and contracts to coerce performance because of the settlement of the lawsuit. And there are some courts that say, you know, there is an exception for settlements. And there's other courts that say, no, we look at it like contracts. We look at it like contracts. We apply contract law. And if we're not going to force penalties just because people have lawyers and they're sophisticated, where's the line on that? Thank you. Thank you, Your Honors. Thank you both for your argument. The case will be submitted with the clerk calling.